**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| **KATHRYN SILCOX,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Cause No. 4:05-CV-59 AS** |
| | ) |
| **THE PRUDENTIAL INSURANCE** | ) |
| **COMPANY OF AMERICA, and** | ) |
| **WABASH NATIONAL CORPORATION** | ) |
| **LONG TERM DISABILITY PLAN,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM, OPINION, & ORDER**

This matter is before the Court on the Motion for Summary Judgment (Docket No. 34) filed by Plaintiff Kathryn Silcox on June 20, 2006 and the Motion for Summary Judgment (Docket No. 40) filed by Defendants The Prudential Insurance Company of America and Wabash National Corporation Long Term Disability Plan on July 10, 2006. The Court heard oral arguments in Lafayette, Indiana on December 11, 2006 and on June 15, 2007, and the issues have been fully briefed. For the reasons stated below, the Plaintiff's Motion for Summary Judgment is **DENIED**, and that Defendants' Motion for Summary Judgment is **GRANTED**.

I. Jurisdiction

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B).

Kathryn Silcox ("Silcox") is a citizen and resident of Cass County, Indiana.  The Prudential Insurance Company of America ("Prudential") is a New Jersey corporation with its principal place of business in Newark, New Jersey and licensed to do business in the state of Indiana.[1]  The Wabash National Corporation Long Term Disability Plan ("the Wabash Plan" or "the Plan") is a long term disability employee welfare benefit plan; it provides disability benefits to its participants in the event they meet the definition of disability set forth in the group insurance policy.  The Wabash Plan is administered in Tippecanoe County, Indiana.

## II.  Background

Silcox began her employment at Wabash National Corporation ("Wabash National") on August 13, 1993, where she was employed as a supervisor.  R. at 465.  Prudential issued a long term disability group insurance policy to Wabash National, underwriting the benefits offered by the Wabash Plan.  R. at 465; Prudential's Answer at ¶ 6.  Silcox is a participant in the Wabash Plan.  *Id*.

On January 26, 2001, Silcox was involved in a motor vehicle accident, sustaining a complex right ankle fracture.  R. at 195, 275, 433, 442.  She underwent surgery, performed by Dr. Thomas Gripe, on January 26, 2001.  R. at 300, 401, 434.  Silcox's medical records indicate that, as a result of the fracture, she has "right tibial nerve superficial and deep peroneal and possible sural nerve injury," degenerative joint disease

---

[1]Prudential is licensed to do business in Tippecanoe County, Indiana.

in the ankle, significant arthritis, complex regional pain syndrome, and Reflex

Sympathetic Dystrophy ("RSD").  R. at 275, 442

On April 30, 2001, Silcox was no longer able to work due to her condition and left

her regular employment with Wabash National.  She had a second surgery[2] on May 3,

2001, and was released to return to work with restrictions on May 31, 2001.  R. at 65, 67,

409-11, 428, 442.  Wabash National was unable to offer Silcox a sedentary position at

that time.  As a result, Silcox's last day of work was June 4, 2001.  R. at 444.

On June 28, 2001, Silcox presented to Dr. Gripe, who noted that she had "a little

bit of left heal pain . . . [which was understandable] considering that the fracture was

open on the side with quite a bit of stretching of all these peripheral nerves."  R. at 393.

Dr. Gripe recommended that Silcox see Dr. Timothy M. Madren for a block

consideration.  *Id*.

Silcox submitted a Long Term Disability ("LTD") claim form to Prudential on

August 22, 2001, seeking disability benefits due to an "open fracture and fracture

dislocation of the right ankle."  R. at 65, 67, 442-45, 464-65. Silcox began receiving long

term disability benefits from Prudential on October 28, 2001.  R. at 144.  In its initial

finding, Prudential found that Silcox was "currently totally disabled from your [her]

---

[2]Following her initial surgery by Dr. Gripe, Silcox underwent a total of six more surgeries.

3

regular occupation."[3]  *Id*.

On October 31, 2001, orthopedic surgeon Dr. Alan K. Koester removed Silcox's "hardware on the lateral aspect of the elbow and also did isolation and excision of a neuroma on the saphenous nerve, and this is buried in the calf muscle."  R. at 380.

Silcox presented to Dr. John Thomas on November 13, 2001.  Dr. Thomas noted that Silcox experienced pain in her ankle, chronic foot pain, and that she was undergoing physical therapy for the RSD through a physical therapist in Kokomo, Indiana.  R. at 398. Dr. Thomas supplied Silcox with Oxycontin 10 mg, #30 with no refills.[4]  *Id*.

Silcox returned to Dr. Koester on December 20, 2001, who noted that she had much less tenderness.  R. at 390-92.  She presented to Dr. Koester again on March 12, 2002, at which time Silcox reported "pain along the posterior lateral aspect of the right foot . . . numbness with Tinel's on the medial aspect of the foot over the medial malleoulous, some pain with pressure on the heel, [and] some lateral tibial joint pain."[5] R. at 380.  Silcox described the pain as "burning" and "stabbing."  *Id*.  Dr. Koester

---

[3]The relevant Policy language sets forth that a covered employee is considered totally disabled when Prudential determines that:
•     You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
•     You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
R. at 24.

[4]At the time of this appointment, Silcox was also taking Paxil and Valium.  R. at 398.

[5]At the time of this appointment, Silcox had weaned off of the Oxycontin.  R. at 380.

diagnosed Silcox with neurogenic pain of the foot and noted that she still had some crepitans and grinding.  *Id.*  Dr. Koester noted that Silcox was walking primarily with a cane and could not tolerate being up for over about a half hour.  *Id.* at 380-81.  Dr. Koester noted that there was not much left for him to do for Silcox and referred her care onto Dr. Virginia Hemelt of Neurology Associates and to Dr. Daniel Daluga, M.D.  R. at 381.  Dr. Koester noted that there were further restrictions per Dr. Hemelt and stated that Silcox was taking Loratab, Neurontin, Paxil, and Vioxx.  R. at 382.  Dr. Koester also provided an attending physician's report to Wabash, stating that Silcox's "return to work was indeterminate."  R. at 381-82. Dr. Koester further stated, "[s]he should have no prolonged standing or walking greater than a half hour per day because she starts getting into intractable pain and swelling."  *Id.*

In June 2002, Silcox presented to Neurologist Dr. Virginia Hemelt.  R. at 359.  In a letter to Dr. Thomas dated September 16, 2002, Dr. Hemelt reported that Silcox experienced severe right ankle pain that worsens with weight bearing.  R. at 359.  As of the date of the letter, Dr. Hemelt noted that Silcox was taking OxyContin 20 mg twice a day, taking Lortab 10/500 mg four to six times per day, and Neurontin 1200 mg twice per day, among other prescriptions.  *Id.*  Dr. Hemelt noted that she had initiated Pamelor at Silcox's last visit to help with mood and pain but that Silcox had not filled that prescription.  *Id.*  Dr. Hemelt again added Pamelor to Silcox's medication regimen.  *Id.* at 360.

In her September 2002 letter, Dr. Hemelt noted that after Silcox's June 2002 visit [with Dr. Hemelt], Silcox underwent a right ankle orthoscopy with Dr. Anthony Miller, a foot and ankle specialist with the Kokomo Clinic, and that Dr. Miller diagnosed Silcox with a sural nerve neuroma and tarsal tunnel syndrome.  R. at 359.  Dr. Miller concluded that Silcox had "Resultant Degenerative Joint Disease and significant Arthritis in the area of the Tibial Tailor Articulation, right, severe nerve damage, including injuries to the Superficial Peroneal nerve, to the deep Peroneal nerve and damage to the Sural nerve." R. at 301.  Dr. Miller noted that Silcox was unable to bear weight without the use of a brace.  *Id*.  Dr. Miller concluded that Silcox's injury caused "irreversible damage to her right lower extremity . . . [and that Silcox] will be unable to return to any type of full time or part time employment with the ankle injuries that she has."  Dr. Miller stated that "the main problem is that she [Silcox] is unable to live her life without constant pain medication . . . Unfortunately, with the current medications that she is taking it may be impossible for any employer to hire her."  *Id*.

In June of 2003, Silcox presented to Dr. Ed Kowlowitz of the Center for Pain Management.[6]  R. at 331.  Dr. Kowlowitz noted that Silcox's:

> pain is most intense in the ankle throughout the entire foot and travels
> cranial primarily to the knee.  She has occasional times when she will
> radiate in through the upper thigh as far as the hip.  She describes primarily
> neuropathic pain but does as well complain of an aching, dull, throbbing,
> sharp, nociceptive component outside the burning.  She rates her pain as

---

[6]In total, Silcox saw Dr. Kowlowitz in a series of fifteen appointments.  R. at 260-72, 277-83, 331-332.

severe, between 8 and 10 on a 10-scale.  Her pain at this point is constant.
It is exacerbated by all weight-bearing.

*Id*.  Dr. Kowlowitz recommended a fluoroscopic-guided sympathetic nerve block.  *Id*. at

332.  He performed a right lumbar sympathetic nerve block on June 13, 2006.  *Id*. at 329-

30.

Silcox saw Dr. Alina Clavijo, Ph.D, H.S.P.P. for a psychological diagnostic

interview on September 3, 2003.  R. at 285.  Again, Silcox described her pain as

"primarily burning, stabbing, shooting, 'like an electric shock through the foot.'"  *Id*.  At

this appointment, Silcox stated that her injury caused limitations in her life including an

inability to exercise, inability to stand for lengths of time, nausea, vomiting and other side

effects from her medication, difficulty caring for herself, difficulty driving, and difficulty

with comprehension.  *Id*. at 285-88.  Dr. Clavijo opined that Silcox suffered from

Adjustment Disorder with depressed mod, RSD of the right lower extremity, and

economic problems.[7]  *Id*. at 288.  Dr. Clavijo noted that Silcox's GAF equaled 70.  *Id*.

On September 8, 2003, Dr. Kowlowitz submitted to State Farm an Attending

Physician's Statement of Disability.  Therein, Dr. Kowlowitz indicated that Silcox was

totally disabled such that she could no longer perform her current occupation or any

occupation.  R. at 316-317.  Dr. Kowlowitz indicated that Silcox was not a suitable

candidate for further rehabilitation services, that her present job could not be modified to

---

[7]Specifically, Dr. Clavijo noted that "patient lost her job when she became disabled and
her income went from $60,000 to $23,000 resulting in patient losing her home and obtaining
negative credit."  R. at 288.

allow for handling with impairment, and that she is "unable to stand or walk and current medications would make patient unable to function in the workplace." *Id*. at 317.

On September 25, 2003, Silcox had a spinal cord stimulator implanted by Dr. Kowlowitz.  R. at 275-76.   In his Procedure Note, Dr. Kowlowitz noted:

> She [Silcox] has clear cut evidence of complex regional pain syndrome and has undergone all appropriate conservative therapies, including multiple injections of the foot, arthroscopic surgery of the foot or focies with persistent vasospastic changes.  She has undergone lumbar sympathetic nerve blocks as well which were of inadequate long-term efficacy. . . . [she] has been on chronic opioids and received more than adequate trial of physical therapy.  She has clearly failed all conservative options and is not a further surgical candidate and has no contraindications such as sepsis, coagulopathy, or psychological barriers to improvement.

*Id.* at 275.  Silcox underwent a second spinal stimulator surgery[8] on October 2, 2003. *Id*. at 273-74.  The second surgery was a result of Silcox's wish "to proceed with a permanent revision of her trial lead and an internalized pulse generator."  *Id*. at 273.

Dr. Kowlowitz completed an assessment of physical capacity for Silcox, stating that her ability to sit was not restricted by her condition, but that she could only stand or walk one-half hour at a time.  R. at 326.  Dr. Kowlowitz opined that, assuming the patient can change positions as needed, during a typical workday, Silcox had an unrestricted ability to sit, but could not walk or stand in excess of two hours.  *Id*.  On October 13, 2003, Silcox reported on a Center for Pain Management Reassessment Form that, on her

---

[8]With the previous spinal stimulator surgery, Silcox had undergone a trial period of one week.  Dr. Kowlowitz noted that Silcox experienced "greater than 50% relief of her pain symptomology . . . [had] become more functional and [was] actually ambulating on her foot in a more biomechanical correct way as well."  R. at 273.

medication, her average pain since her last visit was a 4 to 5 out of 10 on a 10-point

scale.[9]  *Id*. at 271.

After paying long term disability benefits from October 28, 2001 through October

27, 2003, Prudential terminated Silcox's benefits because it concluded that she was no

longer continuously disabled from performing "any occupation" under the terms of the

policy.  Under Silcox's policy, an insured employee is totally disabled [after 24 months of

payments] when Prudential determines, as the result of the same sickness or injury, the

employee is "unable to perform the duties of any gainful occupation for which you are

reasonably fitted by education, training or experience."  R. at 24.  Silcox's policy required

Silcox to provide proof of her claim[10] along with proof that she was under the regular care

of a doctor.  R. at 24.

In November 2003, Dr. Kowlowitz executed a note stating that Silcox was "unable

to return to work."  R. at 318.  And on November 12, 2003 Silcox indicated on a Center

---

[9]At her previous visit, Silcox indicated that her pain was 8 to 10 out of 10 on a 10-point
scale.  R. at 271.

[10]The Policy required Silcox to provide proof of claim, showing:
(1) That you are under the regular care of a doctor.
(2) The appropriate documentation of your monthly earnings.
(3) The date your disability began.
(4) Appropriate documentation of the disabling disorder.
(5) The extent of your disability, including restrictions and limitations preventing
you from performing your regular occupation or gainful occupation.
(6) The name and address of any hospital or institution where you received
treatment, including all attending doctors.
(7) The name and address of any doctor you have seen.
R. at 24.

for Pain Management Reassessment Form that her average pain on medication was a 6 out of 10 on a 10-point scale and that "[c]onstant pain stop[s] me in my tracks [and] put[s] me to bed." *Id.* at 269.

Silcox visited Dr. Kowlowitz on December 17, 2003 and indicated on a Center for Pain Management Reassessment Form that her pain still averaged 6 out of 10 and also noted, "[m]y whole leg feels bruised.  I have to alternate weeks of wearing [the] brace due to sores and pain."  R. at 265.

On December 17, 2003, Silcox requested a first reconsideration of Prudential's decision to terminate Silcox's long term disability benefits.  R. at 311-12.

On May 5, 2004, Silcox presented to Dr. Scott B. Taylor, a medical consultant hired by Prudential, so that Dr. Taylor could assess Silcox's medical status and, in particular, her ability to perform a sedentary occupation.  Dr. Taylor conducted an in-person examination of Silcox.  R. at 235.  At the examination, Silcox rated her pain as 7 to 10 on a 10-point scale and reported a constant burning pain.  R. at 236.  In response to the referral questions, Dr. Taylor recommended "restrictions to limit the patient from standing or walking more than 5 to 10 minutes per half hour without sitting down based on her range of motion, review of radiographs and physical examination." *Id*. at 237.  Dr. Taylor stated that Silcox's current medication regimen would affect her ability to work.  Specifically, he stated that Silcox "is experiencing some difficulty with concentration and complex problem solving, which would be expected with the high dose of Neurontin and

Duragesic that she is taking."[11]  *Id.*

On May 5, 2004, Prudential employed a private investigator to follow Silcox and assess her disability.  R. at 222-225.

On May 7, 2004, the Social Security Administration issued a decision finding that Silcox was totally disabled[12] and entitled to a period of disability commencing September 15, 2001.  R. at 253.

On August 20, 2004, after receiving a letter from Prudential asking him to reevaluate whether Silcox could perform a sedentary occupation, Dr. Taylor provided an addendum to his initial evaluation.  R. at 232.  Dr. Taylor opined that there was nothing that "precludes her from performing a sedentary occupation, including her current medication regimen."  *Id*.  In making this reassessment, Dr. Taylor did not contact Silcox's treating physicians, but rather consulted Silcox's medical records and met with her briefly.

On September 1, 2004, Prudential requested an employability analysis based on Silcox's restrictions and limitations.  R. at 85.  The employability analysis stated that Silcox could be employed as a Order Department Supervisor, Audit Clerk, Credit Clerk,

---

[11]Dr. Taylor noted that Silcox did not drive herself to the appointment; rather a family member drove Silcox the approximate half-hour drive.  R. at 237.

[12]The Social Security Administration defines "disabled" as: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . ."

or Collection Clerk.  *Id*.

On September 2, 2004, Prudential reaffirmed its decision to terminate Silcox's long-term disability benefits.  R. at 181-183.  Silcox appealed this decision on March 12, 2005; Prudential again reaffirmed its decision on April 25, 2005.  R. at 185, 187.

III.  Procedural History

On August 25, 2005, Silcox filed a complaint against Prudential and the Wabash Plan, seeking reinstatement of long-term disability benefits.

Prudential filed an answer and affirmative defenses to Plaintiff's complaint, along with a counterclaim for reimbursement of an overpayment under the terms of the Policy. Prudential's counterclaim includes several allegations.  First, Silcox received $21,311.86 in Personal Social Security Disability Benefits and $9,069.01 in Family Social Security Benefits for the period of March 1, 2002 through October 27, 2003.  Counterclaim Count I, ¶ 8.  Second, under the terms of the Policy, any long-term disability benefits paid by Prudential are offset by the total amount of social security disability benefits received by Silcox for the same period.  Counterclaim Count I, ¶ 9.  Third, Silcox received an overpayment of benefits in the amount of $30,380.87 and repaid Prudential all but $9,069.01 of the overpayment.  Counterclaim Count I, ¶¶ 11-12.  Prudential now seeks payment of the remaining money through its counterclaim.

On November 14, 2005, the Plaintiff filed a motion to dismiss Prudential's counterclaim.  The Court denied Plaintiff's motion to dismiss on September 26, 2006.

*See* Docket No. 49.  Now before the Court are the cross-motions for summary judgment.

IV.  Standards of Review

    A.  *Summary Judgment Standard*

    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)*;  Bragg v. Navistar Int'l Trans. Corp*., 164 F.3d 373 (7th Cir. 1998).  After affording the parties adequate time for discovery, a court must grant summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

    The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor.  *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56); *Larimer v. Dayton Hudson Corp*., 137 F.3d 497 (7th Cir. 1998), *reh'g denied*.  A question of material fact is a question which will be outcome- determinative of an issue in the case.  The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue.  *Anderson*, 477 U.S. at 248.  The moving party may discharge this

initial burden by demonstrating that there is insufficient evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The moving party may also choose to support its motion for summary judgment with affidavits and other admissible material, thereby shifting the burden to the nonmoving party to demonstrate that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977). The nonmoving party cannot rest on its pleadings, *Weicherding v. Riefel,* 160 F.3d 1139 (7th Cir. 1998); *Waldridge v. American Hoechst Corp*., 24 F.3d 918, 920-21 (7th Cir. 1994); nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library* Sys., 60 F.3d 317, 320 (7th Cir. 1995).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560 (7th Cir. 1996). However, the plaintiff must do more than raise a "metaphysical doubt" as to the material facts. *Matsushita*, 475 U.S. at 577; 106 S. Ct. at 1351. Rather, she must come forward with "specific facts" showing that there is a genuine issue for trial. *Id.* at 587 (*quoting* FED. R. CIV. P. 56(e)). Moreover, when parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. *M. Snower & Co. v. United States*, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion

evidences only that the movant believes it is entitled to judgment as a matter of law on the

issues within its motion and that trial is the appropriate course of action if the court

disagrees with that assessment. *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 230 (7th

Cir. 1996).

B. *ERISA Standard of Review*

A "denial of benefits challenged under § 1332(a)(1)(B) is to be reviewed under a

*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." *Diaz v.

Prudential Ins. Co. of America*, 424 F.3d 635, 636-37 (7th Cir. 2005) (quoting *Firestone

Rubber & Tire Co. v. Bruch*, 489 U.S. 101, 113 (1989)).  *See Rud v. Liberty Life Assur.

Co. of Boston*, 438 F.3d 772, 773 (7th Cir. 2006).  The plan at issue here provides:

> This group contract underwritten by The Prudential Insurance Company of
> America provides insured benefits under your Employers ERISA plan(s).
> The Prudential Insurance Company of America as Claims Administrator has
> the sole discretion to interpret the terms of the Group Contract, to make
> factual findings, and to determine eligibility for benefits.  The decision of
> the Claims Administrator shall not be overturned unless arbitrary and
> capricious.

*See* LTD plan documents at 34.  Because the language in the plan gives plan participants

adequate notice that the claims administrator will make decisions that are largely

protected from judicial review, the appropriate standard of review here is arbitrary and

capricious. *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000).

In applying this standard, the court must uphold the plan administrator's decision

as long as (1) "it is not possible to offer a reasoned explanation, based on the evidence, for a particular outcome," (2) the decision "is based on a reasonable explanation of relevant plan documents," or (3) the administrator "has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Hess v. Hartford*, 274 F.3d 456, 461 (7th Cir. 2001) (quoting *Exborn v. Central States, Southeast and Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990)). As long as Prudential's decision has rational support in the record, the Court must uphold the denial of benefits. *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). "'[Q]uestions of judgment are left to the plan administrator,' and 'it is not our function to decide whether we would reach the same conclusion' as the administrator." *Sisto v. Ameritech Sickness and Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005)(quoting *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996)). Deferential review, however, is "'not no review,' and 'deference need not be abject.'" *Hess*, 274 F.3d at 461 (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)). *See also Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996)(holding that "[a]lthough we review the committees' actions in a deferential light, we shall not rubber stamp their decisions.").

V.   Discussion

A.  *Review of the Administrator's Decision*

16

Having established the appropriate standard of review, the Court must now determine whether Prudential's decision to deny Silcox's claim for continuation of her long term disability benefits was correct. In determining whether the denial of disability benefits was arbitrary and capricious, the Court must consider only the facts known to the plan administrator at the time he made his decision. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985). The question, then, is whether there is rational support in the record for Prudential's determination that Silcox was not disabled to the extent that she was unable to perform the duties of any gainful occupation for which she was reasonably fitted by education, training or experience.

Silcox contends that the Social Security Administration's ("SSA") determination that she was totally disabled must be considered in determining whether Prudential's decision was arbitrary and capricious. Silcox notes that a determination of disability by the SSA is not "controlling," but asserts that it is entitled to some weight as evidence of disability under the policy. According to Silcox, Prudential never articulated a valid reason for reaching a different conclusion than the SSA. Plaintiff's Memo in Support at 26. Further, Silcox contends that she "has produced powerful evidence of her disability, including medical records and reports from numerous treating physicians pointing to the

17

debilitating effects of her injury."  Plaintiff's Memo. in Support at 16.  Silcox asserts that

she has "pointed out the lack of evidence that exists in Prudential's efforts to show

Kathryn was not disabled, including the uninformed review of Kathryn's medical records,

the brief Independent Medical Exam ("IME") performed by Dr. Taylor and the fruitless

surveillance attempts by Prudential's investigator."  *Id*.  Additionally, Silcox states that

Dr. Taylor's evaluation itself supports finding Silcox to be disabled. *Id*.  Silcox also

argues that Prudential improperly failed to consider the impact of the narcotic pain

relievers that Silcox took or had taken on her ability to work.  Finally, Silcox contends

that Prudential's decision was arbitrary and capricious because Prudential ignored her

treating physicians' opinions that she was totally disabled.  In support of this contention,

Silcox asserts that her physicians are in a better position to render a decision regarding her

disability than Dr. Taylor, the independent medical examiner hired by Prudential.

Prudential asserts that there is no basis for reversal and requests that the Court

affirm Prudential's decision.  Prudential argues that it acted within its discretion and

"involved a physical therapist, two vocational rehabilitationists, a nurse, its medical

director Dr. Bachman and an independent medical examiner in its claim review."

Defendants' Memo. in Support at 25 (internal citations omitted).

1. *Social Security Administration's Determination of Disability*

The Seventh Circuit has made clear that "[w]hile Social Security decisions, if

available, are instructive, these determinations are not dispositive (except in those cases

18

where a plan ties benefits to the Social Security decision . . .).” *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004). The policy at issue, however, does not require Prudential to consider the SSA's finding of disability in making its own disability determination.

Additionally, Silcox asserts that Prudential assisted Silcox in obtaining Social Security Disability Income (“SSDI”) and contends that the “spirit” of judicial estoppel should apply. Specifically, Silcox contends that Prudential hired ALLSUP INC. to help Silcox obtain Social Security disability benefits – so that Prudential would receive the offset – but then turned around and determined that Silcox was not disabled under its policy. According to Silcox, such action is indicative of fraud.

Although Prudential ultimately benefitted from the SSA determination through the receipt of an offset, it is not clear from the record that Prudential *required* Silcox to seek social security benefits or use ALLSUP, INC. in an effort to obtain those benefits. Silcox fails in her briefs to cite to any page in the record illustrating such conduct by Prudential. Silcox did, however, direct the Court's attention to R. at 238-40 and 370-71 at the second oral argument held in Lafayette, Indiana on June 15, 2007. The Court has reviewed the pages cited by the Plaintiff at the second oral argument; those pages do not indicate that Prudential required Silcox to seek social security benefits or use ALLSUP, INC. in an effort to obtain those benefits but instead simply state that the SSA benefits were awarded. Without evidence to support her claims, Silcox's assertions are merely

skeletal arguments and attorney argument.  *See United States v. Dunkel*, 927 F.2d 955,

956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in

briefs."). Accordingly the Court finds that judicial estoppel, or the "spirit" thereof, does

not apply in this case.  Rather, the SSA determination to award benefits to Silcox is,

instead, just one factor the Court should consider, in the context of the entire record, in

determining whether Prudential's contrary decision was arbitrary and capricious.

> 2. *Whether the Administrator's Decision was Arbitrary and Capricious*

In *Black & Decker v. Nord*, 538 U.S. 822, 123 S.Ct. 1965 (2003), the United States

Supreme Court held that the treating physician rule does not apply in ERISA cases.  The

Court stated, "[W]e hold that plan administrators are not obliged to accord special

deference to the opinions of treating physicians."  *Id*. at 1967.  The Court went on to state:

> Plan administrators, of course, may not arbitrarily refuse to credit a
> claimant's reliable evidence, including the opinions of a treating physician.
> But, we hold, courts have no warrant to require administrators automatically
> to accord special weight to the opinions of a claimant's physician; nor may
> courts impose on plan administrators a discrete burden of explanation when
> they credit reliable evidence that conflicts with a treating physician's
> evaluation.

*Id*. at 1972.  In *Breaton v. CLP Health and Welfare Plan*, this Court stated that *Nord*

teaches "each opinion rendered by a treating physician under ERISA must rest on its own

bottom with no inference or presumption either way.  Certainly that does not countenance

ignoring the opinion of a treating physician."  *Breaton*, 2005 WL 2105892, *3 (N.D. Ind.

Aug. 29, 2005).  Importantly, though, *Nord* prohibits district courts from overturning

discretionary decisions by administrators because they failed to defer to treating physicians' opinions.

In this case, Prudential decision-making considered, but was not limited to the following: Silcox's self-reported pain assessments, the opinions of her treating physicians, an estimation of physical capacities form filled out by one of Silcox's own physicians, the report and addendum of the Independent Medical Examiner, Dr. Taylor, the SSA decision, surveillance videos and reports, and an employability assessment. Prudential also based its conclusion that Silcox was able to function and ambulate on reports and medical records showing that from June 4, 2001 until October 2003, Silcox's condition was improving.

In its original decision to terminate Silcox's disability benefits [effective October 28, 2003], Prudential relied on a Dr. Kowlowitz's notes from Silcox's visit on June 6, 2003, Silcox's self-reported pain management questionnaire on August 9, 2003, and an estimation of physical capacities form filled out by Dr. Kowlowitz on October 10, 2003. In the estimation of physical capacities form, Dr. Kowlowitz opined that Silcox was not restricted with regards to sitting on a continuous basis and that Silcox was capable of standing up to two hours and walking up to two hours during a typical work schedule.

On September 2, 2004, Prudential completed its review of Silcox's first request for reconsideration. R. at 182. Prudential incorporated the reasoning contained in its October 31, 2003 letter and, based on the medical documentation within Silcox's file,

Prudential determined that its decision to terminate benefits was appropriate.  In the course of reviewing Silcox's claim, Prudential obtained Dr. Taylor to perform an IME, and in its re-evaluation, Prudential relied on Dr. Taylor's addendum, which concluded that there was nothing that "precludes her from performing a sedentary occupation, including her current medication regimen."[13]  R. at 183, 232.  Prudential also based its decision on an employability assessment which identified several sedentary gainful occupations, including Order Department Supervisor, Audit Clerk, Credit Clerk, or Collection Clerk, that Silcox would be capable of performing.  R. at 85, 183.

On April 25, 2005, Prudential completed its review of Silcox's second request for reconsideration.  Again, Prudential incorporated the reasoning contained in its October 31, 2003 letter. Prudential again relied on the medical documentation within Silcox's file, Dr. Taylor's examination and addendum, and the employability assessment.  Additionally, Prudential cited to surveillance video on May 4, 2004 in which Silcox "was observed walking without the assistance of a cane and driving her own car, stopping at a gas station, and dispensing fuel into her vehicle while stalking on her cell phone."  R. at 187. Prudential asserted that those "activities also support a sedentary work capacity."  *Id*. Prudential further stated that Silcox did not provide Prudential with any new medical documentation with her second appeal and that "[r]eview of information previously in file from Ms. Silcox's treating physicians and the IME performed by Dr. Taylor support Ms.

---

[13]In reaching this conclusion, Dr. Taylor met with Silcox and reviewed her medical records.  R. at 232.

Silcox's ability to perform a sedentary occupation." R. at 187.

Thus, contrary to Silcox's contention, Prudential based its decision on sufficient evidence. Silcox's own physicians' records, as well as Silcox's subjective descriptions, support Prudential's determination. In fact, Silcox's own doctors, as well as her subjective descriptions, if not their ultimate conclusions, actually aligned with the conclusion ultimately drawn by Prudential. The expert opinions of Drs. Taylor and Kowlowitz established that Silcox could perform sedentary activities, and a transferable skills analysis identified several sedentary jobs for Silcox. R. at 85, 326. Dr. Kowlowitz opined that Silcox's ability to sit was unrestricted and that she could stand or walk two hours during a typical work schedule. R. at 326. Silcox's treating physicians reported that she experienced excellent recoveries after each of her surgeries and her records indicate that she met all of the goals in her physical therapy. R. at 328, 337-38, 391-98, 407-08, 431. Additionally, Silcox reported decreased levels of pain after the spinal cord stimulator surgery, and she was no longer treated with oral narcotics and opiates at the time benefits were terminated. R. at 271, 273, 328, 337-38. Morever, the fact that Silcox was no longer taking oral narcotics and opiates negates Silcox's argument that Prudential failed to assess the effect of her medications, which would reduce concentration and the ability to work.

Even if Silcox's treating physicians' records did not support Prudential's decision, the mere fact that Prudential favored the opinion of Dr. Taylor, the independent medical

23

reviewer, does not make Prudential's decision arbitrary and capricious.  When a plan administrator chooses to rely upon the medical opinion of one doctor over another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation for the plan administrator's decision.  *Trombetta*, 102 F.3d at 1438; *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006).  Thus, even though the doctors, evaluations, and opinions selected by Prudential disagreed or conflicted with some of Silcox's treating physicians' conclusions or Silcox's own assessments of her pain, Prudential made its decision on the basis of sufficient evidence.  *See Sisto*, 429 F.3d at 701 ("[r]aising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and-capricious standard.").  The opinions Prudential relied on where neither unreasonable nor unsupported; therefore, Prudential's decision was not arbitrary and capricious.

B.  *Reimbursement of the Overpayment in the Amount of $9,069.01*

Through its counterclaim, Prudential seeks reimbursement of an overpayment in the amount of $9,069.01.  Prudential asserts that it paid Silcox LTD benefits for the period of October 2001 to October 2003 without accounting for Plaintiff's award of Social Security Disability Benefits ("SSDB"), resulting in an overpayment in the amount of $30,380.87.[14]  Silcox repaid Prudential all but $9,069.01 of the overpayment, and

---

[14]Prudential asserts, and Silcox concedes, that Silcox received $21,311.86 in Personal Social Security Disability Benefits and $9,069.01 in Family Social Security Disability Benefits.

Prudential claims that, under the Policy, it is entitled to reimbursement or offset of that amount.  R. at 28-30, 39; Defendants' Memo in Support at 26.  Silcox asserts that Prudential is precluded from claiming Silcox's social security disability back benefits pursuant to 42 U.S.C. § 407(a), arguing that this section precludes creditors from claiming entitlement to an individual's SSDB.[15]

In this case, however, Prudential is not seeking social security disability back benefits but rather seeks reimbursement for an overpayment of long term disability benefits made under the Policy.[16]  The Policy at issue states:

> Prudential has the right to recover any overpayments due to:
> - fraud
> - any error Prudential makes in processing a claim
> - your receipt of deductible sources of income
>
> You must reimburse us in full . . . Prudential will not recover more money than the amount we paid you.

R. at 39. Social security income is a deductible source of income under the Policy.  R. at 28-30.

Here, Prudential does not seek to recover funds paid by the Social Security Disability Administration or to place a trust over future social security disability payments

---

[15]42 U.S.C. § 407(a) states:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

[16]This overpayment resulted from Silcox's award of social security disability benefits.

25

to Silcox, but rather Prudential seeks to recover the funds already paid by Prudential. Accordingly, the Court finds that 42 U.S.C. § 407(a) does not apply in this case.  Under the language contained in the Policy, Prudential is entitled to recover its overpayment of benefits in the amount of $9.069.01.

VI.  Conclusion

For the foregoing reasons, the Court finds that Prudential did not act arbitrarily and capriciously when it denied long term disability benefits and that it provided a reasoned explanation, based on the evidence, for denying benefits under the plan's provisions. Accordingly, the Court **ORDERS** that Defendants' motion for summary judgment (Docket No. 40) is **GRANTED** and Plaintiff's motion for summary judgment (Docket No. 34) is **DENIED**.  The Court further **ORDERS** the Plaintiff to reimburse Prudential its overpayment of benefits in the amount of $9,069.01.

**SO ORDERED.**

**Dated: August 23, 2007**


                              **S/ ALLEN SHARP**
                    **ALLEN SHARP, JUDGE**
                    **UNITED STATES DISTRICT COURT**

26